**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL ANTHONY, individually, and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>　v.<br><br>THE FEDERAL SAVINGS BANK, an Illinois Federal Savings Association, and NATIONAL BANCORP HOLDINGS, INC., a Delaware corporation, and FDE MARKETING GROUP LLC, a Florida limited liability company,<br><br>　　　Defendants. | Case No.: 1:21-cv-2509<br><br>**District Judge Edmond E. Chang** |

**PLAINTIFF'S COMBINED MOTION FOR CLASS CERTIFICATION**
**AND MOTION TO BAR DEFENSE EXPERT JAN KOSTYUN,**
<u>**AND CONSOLIDATED MEMORANDUM OF LAW**</u>

Thomas A. Zimmerman, Jr. (IL #6231944)
*tom@attorneyzim.com*
Jeffrey D. Blake
*jeff@attorneyzim.com*
Zimmerman Law Offices, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020
Facsimile: (312) 440-4180
*www.attorneyzim.com*

Mark L. Javitch (admitted *pro hac vice*)
*mark@javitchlawoffice.com*
Javitch Law Office
3 East 3rd Avenue, Ste. 200
San Mateo, California 94401
Telephone: (650) 781-8000
Facsimile: (650) 648-0705

*Attorneys for Plaintiff and the putative Classes*

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................1

II.    FACTUAL BACKGROUND ..................................................................................3

    A.    Defendants' Telemarketing Campaign ......................................................3

    B.    The Expert Opinion of Aaron Woolfson .....................................................4

    C.    The Expert Rebuttal Report of Jan Kostyun .............................................6

    D.    Woolfson's Reply to Kostyun's Rebuttal Report ......................................8

III.   LEGAL STANDARD ............................................................................................10

IV.    ARGUMENT ........................................................................................................11

    A.    The TCPA Do Not Call ("DNC") Provision............................................11

    B.    The Classes Satisfy Rule 23(a)(1)–(4) .....................................................11

        1.    Ascertainability .............................................................................11

        2.    Numerosity.....................................................................................12

        3.    Commonality...................................................................................12

        4.    Typicality .......................................................................................13

        5.    Adequacy .......................................................................................14

    C.    The Classes Satisfy Rule 23(b)(2) ............................................................15

    D.    The Classes Satisfy the Predominance Requirement of Rule 23(b)(3).................15

        1.    Consent ..........................................................................................15

        2.    Vicarious Liability .........................................................................17

            a.    Actual Authority ................................................................17

            b.    Apparent Authority .........................................................21

            c.    Ratification......................................................................21

  E.  The Classes Satisfy the Superior Requirement of Rule 23(b)(3)...........................22

V. CONCLUSION.........................................................................................................25

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997)..................................................................................................14

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
   568 U.S. 455 (2013)..............................................................................................10, 15

*Anderson v. Weinert Enters., Inc.*,
   986 F.3d 773 (7th Cir. 2021) ...................................................................................12

*Aranda v. Caribbean Cruise Line, Inc.*,
   179 F. Supp. 3d 817 (N.D. Ill. 2016) ...................................................................20, 21

*Aranda v. Caribbean Cruise Line, Inc.*,
   202 F. Supp. 3d 850 (N.D. Ill. 2016) ...................................................................12, 13

*Bakov v. Consol. World Travel, Inc.*,
   15 C 2980, 2019 WL 1294659 (N.D. Ill. Mar. 21, 2019) ..................................1, 23, 24

*Bell v. PNC Bank, N.A.*,
   800 F.3d 360 (7th Cir. 2015) ...................................................................................10

*Bilek v. Fed. Ins. Co.*,
   8 F.4th 581 (7th Cir. 2021) ......................................................................................17

*Birchmeier v. Caribbean Cruise Line, Inc.*,
   302 F.R.D. 240 (N.D. Ill. 2014).................................................................................24

*Blow v. Bijora, Inc.*,
   855 F.3d 793 (7th Cir. 2017) ...................................................................................16

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) .................................................................................12

*East Tex. Motor Freight System, Inc. Rodriguez*,
   431 U.S. 395 (1977)..................................................................................................14

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*,
   29 F.4th 839 (7th Cir. 2022) ...................................................................................16

*Griffith v. ContextMedia, Inc.*,
   No. 16-cv-2900, 2018 WL 372147 (N.D. Ill. Jan. 11, 2018)......................................1

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   581 F. Supp. 3d 1029 (N.D. Ill. 2022) .......................................................................10

*In re Monitronics Int'l, Inc. Tel. Consumer Protection Act Litig.*,
   No. 1:13-MD-2493, 2019 WL 7835630 (N.D.W.V. Apr. 3, 2019)............................................20

*Keim v. ADF MidAtlantic, LLC*,
   328 F.R.D. 668 (S.D. Fla. 2018)................................................................................25

*Knapper v. Cox Communications, Inc.*,
   329 F.R.D. 238 (D. Ariz. 2019) .................................................................................25

*Kolinek v. Walgreen Co.*,
   311 F.R.D. 483 (N.D. Ill. 2015).................................................................................13

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999).................................................................................................10

*Lushe v. Verengo Inc.*,
   CV 13-07632 AB R, 2014 WL 5794627 (C.D. Cal. Oct. 22, 2014)....................................19, 20

*Meek v. Archibald & Meek, Inc.*,
   No. 21-CV-02397, 2021 WL 2036535 (N.D. Ill. May 21, 2021)..........................................15

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) .....................................................................11,12, 20, 24

*Paldo Sign & Display Co. v. Topsail Sportswear, Inc.*,
   No. 08-CV-5959, 2010 WL 4931001 (N.D. Ill. Nov. 29, 2010) .........................................16

*Remijas v. Neiman Marcus Grp., LLC*,
   794 F.3d 688 (7th Cir. 2015) ....................................................................................20

*Retired Chicago Police Ass'n v. City of Chicago*,
   7 F.3d 584 (7th Cir. 1993) .......................................................................................10

*Ross v. Gossett*,
   33 F.4th 433 (7th Cir. 2022) ...............................................................................12, 15

*Saf-T-Gard Int'l, Inc. v. Vanguard Energy Services, LLC*,
   12 C 3671, 2012 WL 6106714 (N.D. Ill. Dec. 6, 2012) ....................................................13

*Smith v. State Farm Mutual Auto. Ins. Co.*,
   30 F. Supp. 3d 765 (N.D. Ill. 2014) ...........................................................................18

*Snyder v. Ocwen Loan Servicing, LLC*,
    258 F. Supp. 3d 893 (N.D. Ill. 2017) ...................................................................................15

*Starr v. Chicago Cut Steakhouse, LLC*,
    75 F. Supp. 3d 859 (N.D. Ill. 2014) ...................................................................................10

*Toney v. Quality Res., Inc.*,
    75 F. Supp. 3d 727 (N.D. Ill. 2014) ...............................................................................17, 21

*Toney v. Quality Res., Inc.*,
    323 F.R.D. 567 (N.D. Ill. 2018) .........................................................................................11

*Wagner v. NutraSweet Co.*,
    95 F.3d 527 (7th Cir. 1996) ...............................................................................................13

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................................................12

*Williams v. Pillpack LLC*,
    343 F.R.D. 201 (W.D. Wash. 2022) ....................................................................................17

*Yates v. Checkers Drive-In Rest., Inc.*,
    17 C 9219, 2020 WL 6447196 (N.D. Ill. Nov. 3, 2020)......................................................25

## Statutes and Rules

47 U.S.C. § 227(c) ................................................................................................ *passim*

47 C.F.R. § 64.1200(c)...............................................................................................11, 16

Fed. R. Civ. P. 23................................................................................................. *passim*

Fed. R. Evid. 702 ...........................................................................................................10

## Miscellaneous Authorities

*In the Matter of the Joint Petition Filed by Dish Network, LLC*,
    28 F.C.C. Rcd. 6574 (F.C.C. 2013) ....................................................................................21

## I.  INTRODUCTION

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Rule 702 of the Federal Rules of Evidence, and the Court Order of March 16, 2023 (Dkt. 125), Plaintiff Michael Anthony ("Plaintiff") files his combined:

**(1)**  Motion for Class Certification of the "National DNC Class":

> All persons within the United States whose phone numbers (i) are included in the Ytel call detail records of FDE Marketing Group, LLC ("FDE") produced in this matter, and (ii) received more than one call from FDE in any twelve-month period while their phone numbers were registered on the National Do Not Call Registry for at least 30 days.

Plaintiff also seeks certification of the "Transfer Subclass":

> All members of the National DNC Class whose call resulted in a transfer to The Federal Savings Bank ("FSB") or National Bancorp Holdings, Inc. ("NBH").[1]

**(2)**  Motion to Bar Defense Expert Jan Kostyun.

The National DNC Class and the Transfer Subclass (collectively, the "Classes")[2] satisfy the four elements of Fed. R. Civ. P. 23(a) and the elements of Fed. R. Civ. P. 23(b)(2) and (b)(3). The National DNC Class consists of 2,294,457 phone numbers that were called by FDE 34,363,756 times in violation of the TCPA, on behalf of FSB and NBH to offer to sell mortgage-related financial services and products. The Transfer Subclass consists of 27,088 of the National DNC Class members whom FDE transferred or attempted to transfer to FSB or NBH.

---

[1] Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action and members of their immediate families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Subclass; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

[2] "Plaintiffs are not required to amend their Complaint prior to filing for class certification to delineate the exact contours of their class." *Bakov v. Consol. World Travel, Inc.*, 15 C 2980, 2019 WL 1294659, at *15 (N.D. Ill. Mar. 21, 2019) (citing *Griffith v. ContextMedia, Inc.*, No. 16-cv-2900, 2018 WL 372147, at *2 (N.D. Ill. Jan. 11, 2018) ("[T]he law of this circuit does not mandate denial of certification on the principle that plaintiff must stick to the definition proposed in her complaint.").

1

Common factual and legal questions abound, including: (1) whether FDE acted on behalf of FSB and NBH; (2) whether the telephone calls were placed for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services; (3) whether Defendants had prior express written consent to place the phone calls; (4) whether the FDE's call detail records ("CDRs") contain information sufficient to determine Class membership; (5) whether Class members are entitled to statutory damages pursuant to 47 U.S.C. § 227(c)(5)(B) and injunctive relief pursuant to 47 U.S.C. § 227(c)(5)(A); and (7) whether Defendants willfully or knowingly violated the TCPA, warranting enhanced statutory damages under 47 U.S.C. § 227(c)(5)(C).

These numerous common issues predominate and show that a class action is a superior method of adjudication of the controversy. A trial would be manageable and would be a highly efficient way to resolve millions of claims in one go. Identifying and notifying Class members is feasible using telephone carrier records and methods approved by courts around the U.S. and in this District. *See* Declaration of Aaron Woolfson ¶¶ 44–51, 56 ("Woolfson Decl."), attached hereto as Exhibit A1; Errata and Amendment to Declaration of Plaintiff's Expert Aaron Woolfson, attached hereto as Exhibit A2 ("Woolfson Amendment").

In addition, Jan Kostyun's ("Kostyun") December 2, 2022 Expert Rebuttal Report, attached hereto as Exhibit B, should be stricken, and any testimony or evidence based on or contained therein excluded, because Kostyun employs methodologies and asserts opinions that do not meet the standards for expert testimony under Federal Rule of Evidence 702.

For the reasons set forth below and in Plaintiff's upcoming Consolidated Reply Brief, Plaintiff requests that the Court grant his Motion for Class Certification and Motion to Bar Defense Expert Jan Kostyun.

## II. FACTUAL BACKGROUND

### A. Defendants' Telemarketing Campaign

FSB engages live telephone call transfer vendors—one of whom was FDE[3]—who engage in outbound telemarketing to people to offer loan products sold by FSB and to transfer those people directly to an FSB loan officer to close the sale. Deposition of Margaret Dziuban ("Dziuban Dep.") 13:16–23, excerpts attached hereto as Exhibit F; Deposition of Frank Bisesi ("Bisesi Dep.") 63:5–20, excerpts attached hereto as Exhibit I. The purpose of these calls is to sell FSB's products. Dziuban Dep. 18:11–24. Defendants' unsolicited phone calls are vital to FSB's business. Around 99% of FSB's new business comes from these vendors. Deposition of Howard Korey ("Korey Dep."), 9:2–9, attached hereto as Exhibit G.

FSB advances large sums of money to FDE to place calls on its behalf. *See* Plaintiff's Deposition Exhibit ("PE") 2, attached as Exhibit E, at p.2[4]; Korey Dep. 38:10–14. The amount of FSB's cash advance depends on the parties' expectations of how many leads will be generated during a pay period. Deposition of Eric Katz, Day Two, ("Second Katz Dep.") 12:6–7; 65:13–22, excerpts attached hereto as Exhibit H; Dziuban Dep. 47:8–12. FSB compensates FDE at an agreed upon rate of around $90 for each live transfer, and the money is drawn against the "budget" that was advanced from FSB to FDE. Dziuban Dep. 16:16–24; Bisesi Dep. 78:4–23. When the budget gets low, FDE issues an invoice and the funds are replenished by FSB and drawn down as transfers take place. Bisesi Dep. 78:9–81:11. Defendants share access to a program called Boberdoo, where they retrieve in real time information concerning the budget, leads transferred, and refund requests.

---

[3] FDE filed articles of dissolution with the Florida Secretary of State on November 11, 2022, shortly after Plaintiff's original motion for class certification was filed with the Court on October 26, 2022. *See* Exhibit P.

[4] For ease of reference, pinpoint citations to Plaintiff's Deposition Exhibits ("PE") are to the Exhibit E page numbers that are directly above the Bates number situated in the lower right-hand corner of the page.

Korey Dep. 38:20–24; Dziuban Dep. 20:15–21:4; Second Katz Dep. 136:17–22.

FSB has the sole power to determine the criteria (a/k/a "filters") (such as credit score, loan amount, interest rate, etc.) of persons FSB desires to be transferred, and FSB communicates those criteria to FDE. Dziuban Dep. 41:1–14; Bisesi Dep. 63:5–20. FDE "used those filters to determine who to place calls to." Bisesi Dep. 173:2–10. Once FDE determined that it had a potential lead on the line, the FDE representative would call FSB's phone number and post the lead data through a posting URL directly into FSB's systems. Dziuban Dep. 17:20–18:1; Korey Dep. 35:23–36:20.

FDE buys leads from third parties. Bisesi Dep. 46:3–47:2. FDE purchased one such list from DiaGroup LLC, containing approximately 50,000 leads, one of which included Plaintiff's phone number, associated with a name that is not his (Needle Dee), and contact information that is not his. *See* Bisesi Dep. 66:4–7, PE 22. The Jornaya "LeadiDs" that purportedly verified the leads were shams. *See* Jornaya Subpoena Response, pp. 5–7, 57–58, attached hereto as Exhibit D.

**B.      The Expert Opinion of Aaron Woolfson**

Defendants were uncooperative in providing the requested CDRs in discovery, so Plaintiff obtained the CDRs from Ytel, Inc. ("Ytel"). *See* Declaration of Patrick Kennedy and Email, attached hereto as Exhibit O. Patrick Kennedy is custodian of records for Ytel. *Id*. Ytel is "the telecommunications platform and carrier service provider for FDE." Kennedy Decl. ¶ 4. The Ytel CDRs "consist of call detail records for FDE's Ytel account showing all incoming and outgoing calls transmitted by Ytel for FDE." *Id.* ¶ 6. The CDRs were produced on February 18, 2022, and the first logged call occurred on December 11, 2019.[5]

Aaron Woolfson ("Woolfson"), a telecommunications expert, organized and analyzed the CDRs. *See* Woolfson Decl. ¶ 30. Woolfson opines that he can identify connected phone calls to

---

[5] If class certification is granted, Plaintiff intends to seek supplemental CDR files from Ytel for calls occurring after the date of production of the CDRs in this case.

numbers registered on the DNC for more than 30 days and that were within 365 days of another call to the same phone number. *Id.* Woolfson applied a series of queries, or a waterfall analysis, to filter out duplicates, unconnected phone calls, calls to non-TCPA eligible phone numbers or numbers that were not assigned to a telecommunications service provider when called, calls to phone numbers that were not registered on the National DNC list more than 30 days, and lastly, calls to phone numbers that were not connected two or more times within 365 days. *Id.* ¶¶ 33–34; Woolfson Amendment ¶ 8. Woolfson employs similar database analysis methodologies on behalf of defendants and plaintiffs in various litigation. Woolfson Decl. ¶ 15.

Every day, the FTC produces a complete list of the telephone numbers that are on the National DNC list. Woolfson Decl. ¶ 52. By using SQL queries to compare the telephone numbers that were called by Defendants to the index of each day's DNC list, and the incremental additions and deletions of numbers from these lists, Woolfson is able to determine which of the numbers appearing within the CDRs were also on the DNC list, and whether those numbers were on the National DNC list for more than 30 days when they were called. *Id.* Woolfson's DNC list index features a total of 789 complete DNC daily files between January 1, 2017 and January 16, 2023. Starting on October 7, 2020, Woolfson downloaded the DNC files daily. Reply Declaration of Aaron Woolfson ("Woolfson Reply") ¶ 34, n. 15, attached hereto as Exhibit C. Woolfson's waterfall analysis determined that there were 34,363,756 phone calls to 2,294,457 unique phone numbers that received two or more calls within 365 days while on the FTC's DNC list for more than 30 days. Woolfson Amendment ¶ 10.

Woolfson also identified 27,088 unique phone numbers in the National DNC Class numbers that also appear in the FSB live transfer log files labeled "*TFS-TFSB000224-000425.txt*" and "*Supplemental TFSB FDE Call log.csv*". Woolfson Amendment ¶ 10. Lastly, Woolfson

5

explained a process for matching names and addresses to the phone numbers Woolfson identified as Class members.[6] Woolfson explains that carriers maintain historical records that can be used to identify whether a line is classified as residential or business, as well as contact information for the subscriber for the phone number. Woolfson Decl. ¶ 45. The carriers' records are standardized and electronically portable using Electronic Data Interchange ("EDI") protocol. *Id*. ¶ 46. The EDI protocol encompasses a well-defined, regimented set of informational exchanges, and provides an efficient manner to handle, and route, port-in and port-out requests using a common set of data attributes. *Id*. Woolfson proposes to use the telecommunications vendor TelLingua[7] to build an EDI information exchange database from the CDRs to organize the Class members' phone numbers by carrier for purposes of issuing requests for contact information associated with those subscribers that are maintained in the EDI format in the ordinary course of carriers' business. *Id*. ¶ 51. This is a largely automated, standardized, and ministerial process that is rendered necessary by Defendants' indiscriminate calling practices, acquisition of illegitimate lead information, and poor recordkeeping in violation of the TCPA.

### C.    The Expert Rebuttal Report of Jan Kostyun

Defendant's Rebuttal Expert, Jan Kostyun ("Kostyun"), makes four challenges to Woolfson's Declaration and Opinions: (1) the CDRs are unreliable; (2) Woolfson's National DNC Class included phone calls to phone numbers called were not on the DNC list for 30 days when called; (3) Woolfson's Transfer Subclass is overinclusive because it would include attempted

---

[6] FSB's live transfer logs and the DiaGroup lead list containing Plaintiff's phone number have contact information, such as name, address, email, and phone number, that also may be used or referenced to conduct a notice plan, as well.

[7] TelLingua is the same authoritative database that telephone companies use when tagging numbers for historical isWireless and isPorted purposes. TelLingua is reliably and accurately able to provide the data from NeuStar and TelCordia to their customers for real-time and historical purposes, and is used by dozens of large telephone companies, including Utility Telephone and Consolidated Communications, for purposes of obtaining the authoritative routing information from National Exchange Carrier Association ("NECA"), TelCordia, and NeuStar, for real-time and historical purposes. Woolfson Decl. ¶ 26, n.13.

transfers and entries that Kostyun asserts are not associated with any outbound call by FDE; and (4) there are a number of hurdles to the process for obtaining contact information. Expert Rebuttal Report of Jan Kostyun ("Kostyun Report") ¶ 1, attached hereto as Exhibit B.

Kostyun's methodology is not reproducible. His report is the product of "hundreds and hundreds of queries against the data" to test unstated hypotheses that Kostyun discards, modifies, or builds into his expert report. Deposition of Jan Kostyun ("Kostyun Dep.") 19:24–21:1, attached hereto as Exhibit Q. Kostyun is unable to "itemize" each query he ran, recount which queries produced no results, or to share which results were not consistent with his arguments. *Id*. at 24:12–18. Kostyun did not document and did not recall instances when his queries confirmed Woolfson's findings. *Id*. at 25:2–12.

Kostyun first asserts that the CDRs are unreliable. Kostyun bases this conclusion on three findings: (1) the CDRs report entries where FDE places calls to its own phone numbers (Kostyun Report ¶¶ 18–20); (2) the CDRs do not include call disposition information (Kostyun Report ¶¶ 21–30); and (3) Ytel reports non-zero-second duration calls to phone numbers that the North American Numbering Plan Administration ("NANPA") lists as unavailable for assignment to a phone carrier (Kostyun Report ¶¶ 31–35). Kostyun speculates that some glitch plagued the CDRs but does not diagnose or describe the cause of the supposed glitch. Kostyun Dep. 29:5–23.

Next, Kostyun takes issue with Woolfson's analysis of the National DNC Class by identifying (as part of his hundreds and hundreds of queries) isolated instances where Kostyun, using the FTC's Registration Verification Email tool, determined that the date identified on the FTC's registration email post-dated the calls in the CDRs identified by Woolfson as DNC violations. *See* Kostyun Report ¶¶ 47–69; Table 1 of Kostyun Report. But Kostyun revealed in his deposition that he misused the FTC Registration Verification Email tool for this purpose:

7

Q. Does the email lookup tool give you the information you need to determine whether a number was on the DNC list at the time of the calls?

A. Only in the circumstance where it specified a date that happened to correspond with – correspond or be close to any of the call dates.

Q. But you are using it in the context where the call dates were prior to the date on the email lookup tool; is that right?

A. That's correct.

Kostyun Dep. 100: 4–13. The DNC lists Kostyun had in his possession contradicted his findings as to some phone numbers he claimed were not on the DNC until later. *Id*. 94:5–95:24.

Next, Kostyun argues that National DNC Class members whose transfer to FSB was not connected should not be eligible for Transfer Subclass membership. Kostyun Report ¶ 104. Kostyun also asserts that Woolfson erroneously included a small subset of entries for which the phone number from Ytel CDRs is included in the Transfer logs in the Reference ID field rather than phone number field. *Id*. ¶¶ 86–90.

Finally, Kostyun asserts that the method for obtaining contact information of Class members is not "practical." *Id*. ¶¶ 117–118. Kostyun states that phone carriers are required to maintain subscriber information and that the processes for maintaining authorized user information is a voluntary process. *Id*. ¶¶ 125, 127. Kostyun states that phone carriers have record retention periods that may have run their course since the calls were placed by Defendants. *Id*. ¶ 122. Kostyun points out that there are large number of carriers operating in the United States. *Id*. ¶ 132. Kostyun also opines that consent from the subscriber may be legally required to obtain contact information. *Id*. ¶ 133.

**D.     Woolfson's Reply to Kostyun's Rebuttal Report**

In his Reply to Kostyun's report, Woolfson explains that the outbound/inbound phone calls were probably test calls and not a symptom of a glitch. Woolfson Reply ¶ 14. Woolfson also refutes

Kostyun's assumption that phone numbers marked as unassigned can never be connected. *Id*. ¶ 29. In addition, Woolfson provides a detailed description of how a telephone call traverses a telephone network, and how a connection is made—sufficient to show that a non-zero second duration phone call indicates a connected call. *Id*. ¶¶ 15–26. In correspondence with Patrick Kennedy, it was confirmed that Ytel bills in 6 second increments, and 6 second calls are calls that are answered or connected to an answering machine. *See* Email from Patrick Kennedy, Exhibit O. Ytel does not charge for calls of zero second duration, because these calls were not answered. *Id*. Ytel does not maintain additional call disposition information. *Id*.

Woolfson responds to Kostyun's analysis of the National DNC Class by explaining that the FTC's registration verification tool does not keep track of historical dates of registration, but rather, are overwritten by subsequent registrations. Woolfson Reply ¶¶ 42–43. Thus, the email results may indicate one date of registration, but not necessarily the first date.

Regarding Kostyun's critique of the Transfer Subclass, Woolfson identifies Kostyun's failure to off-set time zones between the CDRs and the live transfer files. *Id*. ¶ 52. Woolfson explains that his way of matching up the outbound call on the CDR with entries on FSB's live transfer files by accounting for the change in time zone is a sound way of identifying Transfer Subclass members. *Id*. ¶¶ 53–54.

Lastly, Woolfson responds to Kostyun's arguments that Class members cannot practically be notified. *Id*. ¶¶ 57–59. Woolfson explains that phone carriers as a business necessity must efficiently handle transition requests from customers, especially because there can be thousands of phone numbers that are ported between carriers every day. *Id*. ¶ 58. The EDI format exists to standardize and automate the exchange of customer information. *Id*. Using the records that carriers use to communicate with each other is a largely ministerial process whereby the information that

9

is exchanged in the ordinary course of business among phone carriers is obtained, which can be provided to a court-approved class notice provider.

## III. LEGAL STANDARD

Class certification is appropriate if the prerequisites of Rule 23(a) are satisfied and any one of the subsections of Rule 23(b)(1)–(3) is met. *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 373 (7th Cir. 2015). The party seeking class certification assumes the burden of demonstrating that certification is appropriate. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). A district court has broad discretion to determine whether certification of a class is appropriate. *Id.* Before deciding whether to allow a case to proceed as a class action, the court "must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Starr v. Chicago Cut Steakhouse, LLC*, 75 F. Supp. 3d 859, 871 (N.D. Ill. 2014). Class certification does not license a free-ranging determination into the merits. *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 466 (2013).

The court has a gatekeeping obligation to determine whether expert testimony is admissible. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1045 (N.D. Ill. 2022) (quoting Fed. R. Evid. 702).

## IV.    ARGUMENT

### A.    The TCPA Do Not Call ("DNC") Provision

The TCPA targets unauthorized calls spamming consumers who have specifically followed the procedure authorized by statute, and established by the Federal Communications Commission ("FCC"), to put their phone numbers on the list of people who have formally requested to stop receiving telemarketing phone calls. Section 227(c) of the TCPA directs the FCC to formulate regulations to protect telephone subscribers' privacy rights, and authorizes the establishment of a national database to compile the numbers of telephone subscribers who object to receiving telephone solicitations. 47 U.S.C. § 227(c)(2)–(3). The regulations promulgated pursuant to section 227(c) prohibit the initiation of any telephone solicitation to a telephone subscriber who has registered his or her telephone number on the National Do Not Call Registry. 47 C.F.R. § 64.1200(c). Section 227(c)(5) of the TCPA establishes a private right of action for a person who has received more than one telephone call within any twelve-month period by or on behalf of the same entity in violation of these regulations.

### B.    The Classes Satisfy Rule 23(a)(1)–(4)

1.    **Ascertainability:** To be certified, a class must be defined clearly, and membership must be defined by objective criteria. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). Here, Plaintiff's proposed class definitions are ascertainable because they rely upon objective criteria, as opposed to the state of mind of the Class members. *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 581 (N.D. Ill. 2018) ("whether a person subscribed to a cell phone number on the class list, received a call on her cell phone from Quality through an ATDS, or was marketed Sempris products are all objective criteria"). Nothing in Rule 23 mentions or implies any requirement that there be an administratively feasible way to identify class members. *Mullins*, 795

11

F.3d at 657; *see also Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1132 (9th Cir. 2017) ("the language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification."). Nevertheless, Woolfson proposes an administratively feasible way, using the EDI protocol, to connect phone numbers to Class members' identities. Woolfson Decl. ¶¶ 44–51, 56. This process is made necessary by Defendants' failure to attempt to obtain or preserve accurate contact information for those they called.

2.      **Numerosity:** Numerosity is generally met with 40 or more persons. *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021). Numerosity depends on "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute." *Id*. Here, 2,294,457 phone numbers are in the National DNC Class, and 27,088 are in the Transfer Subclass. Woolfson Amendment ¶ 10. Moreover, Class members are dispersed. Deposition of Eric Katz, Day One (First Katz Dep.) 17:2–7, attached hereto as Exhibit J. Individual claims are small. Therefore, numerosity is satisfied.

3.      **Commonality:** "[I]n order to satisfy commonality, the plaintiffs' claim must 'depend on a common contention' and '[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Ross v. Gossett*, 33 F.4th 433, 437 (7th Cir. 2022) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). The concrete injury vindicated by the TCPA is shared commonly among all Class members. *See Aranda v. Caribbean Cruise Line, Inc.*, 202 F. Supp. 3d 850, 858–59 (N.D. Ill. 2016) ("the intangible, concrete injury plaintiffs allege is that defendants violated a right Congress sought to protect through section 227: the right to be free from prerecorded non-

emergency telemarketing calls they did not consent to receive").

Here, the CDRs show who was called, how many times, and when. *See* Woolfson Decl. ¶¶ 3–4. Every TCPA violation is remedied by the same amount in statutory damages. *See* 47 U.S.C. § 227(c)(5). Transfer Subclass members may recover even if they were transferred to FSB and even if they purchased FSB's goods and services. *See Aranda*, 202 F. Supp. 3d at 858–59 ("even plaintiffs who completed the survey, spoke with a CCL representative, and accepted defendants' vacation offer had a right to be free from unsolicited telemarketing calls, just as a homeowner has a right to be free from trespass even if she accepts a gift from the trespasser after he commits the offense"). Questions related to FSB's and NBH's liability, and each Defendant's enhanced liability for knowing or willful violations, can be resolved using the same evidence for each Class member.

**4.     Typicality:** Typicality is satisfied when the named plaintiff's claim and those of the class members have a common legal theory, even if there are some factual variations. *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 491 (N.D. Ill. 2015). "Typicality requires that the named plaintiff's claims be typical of those of the class at large, rather than premised on varying practices or diverging courses of conduct by the defendants." *Saf-T-Gard Int'l, Inc. v. Vanguard Energy Servs., LLC*, 12 C 3671, 2012 WL 6106714, at *4 (N.D. Ill. Dec. 6, 2012). "Typicality under Rule 23(a)(3) should be determined with reference to the [defendant's] actions," rather than potential defenses to individual class members. *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996).

Here, Plaintiff's and Class members' claims all arise from the same course of conduct (*i.e.*, Defendants' telemarketing practices) and share a common legal theory (*i.e.*, Do Not Call violations and vicarious liability). *See* FAC ¶¶ 61–68. The essential characteristics of the claims are the same. Plaintiff and each Class member had their phone number registered on the DNC registry for at least 30 days, and were called more than once in a 12-month period by FDE. Woolfson Decl. ¶¶

13

38–43. In addition, Defendants' practices with respect to each Class member are the same. They used Ytel to place the calls to people based on lists purchased from third parties with the aim of selling FSB's products and services. *See* Bisesi Dep. 32:15–22, 46:3–47:2; Dziuban Dep. 18:11–24, 100:16–20.

      **5.**      **Adequacy:** Adequacy addresses whether there are any conflicts of interest between Plaintiff and the Class. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Id*. (quoting *East Tex. Motor Freight System, Inc. Rodriguez*, 431 U.S. 395, 403 (1977)). The "[a]dequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Amchem*, 521 U.S. at 626 n.20.

Plaintiff and Class members have identical interests in prosecuting TCPA claims to put a stop to Defendants' unlawful practices and to obtain redress for Defendants' DNC violations. No unique defenses to Plaintiff's claims can be maintained by Defendants. Defendants voluntarily withdrew their counterclaim. Dkt. 97. Any recovery on behalf of the Classes in this matter will have been attributable to Plaintiff's efforts to identify Defendants and pursue this matter undaunted by Defendants' baseless accusations. Plaintiff's fortitude bolsters his adequacy.

In addition, Plaintiff has retained competent counsel to prosecute the case. Plaintiff and Class Counsel are committed to vigorously prosecuting this action to a favorable resolution, consistent with their track record. *See* Firm Bio of Zimmerman Law Offices, P.C., attached hereto as Exhibit K, and Firm Bio of Javitch Law Office, attached hereto as Exhibit L.

14

## C.     The Classes Satisfy Rule 23(b)(2)

Rule 23(b)(2) of the Federal Rules of Civil Procedure allows certification where the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding relief is appropriate respecting the class as a whole. *Snyder v. Ocwen Loan Servicing, LLC*, 258 F. Supp. 3d 893, 903 (N.D. Ill. 2017).

The possibility that defendants would not have sufficient resources to pay a money judgment could also make injunctive relief appropriate. *Meek v. Archibald & Meek, Inc.*, 21-CV-02397, 2021 WL 2036535, at *6 (N.D. Ill. May 21, 2021). Given the potential liability for past violations Defendants face in this litigation, there is a substantial possibility that Defendants may be unable to satisfy money judgments in *subsequent* class actions. Therefore, injunctive relief is not merely the foundation for subsequent determinations of liability, *see Mauer v. American Intercontinental University, Inc.*, No. 16 C 1473, 2016 WL 4698665, at *5 (N.D. Ill. Sept. 8, 2016), but separate, necessary relief to fully protect Class members in the future.

## D.     The Classes Satisfy the Predominance Requirement of Rule 23(b)(3)

"The Rule 23(b)(3) standard 'requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.'" *Ross*, 33 F.4th at 439 (quoting *Amgen*, 568 U.S. at 459). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member; a common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, class-wide proof." *Id.* Here, no individualized issues are presented, let alone ones sufficient to outweigh the substantial classwide issues.

**1.     Consent:** To make telephone solicitations to persons registered on the DNC, Defendants would have needed their prior express invitation or permission, evidenced by a

15

signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed. 47 C.F.R. § 64.1200(c)(2)(ii). Consent is an affirmative defense on which Defendants bear the burden of proof. *Blow v. Bijora, Inc.*, 855 F.3d 793, 803 (7th Cir. 2017). If a defendant has no evidence of consent, then individualized issues regarding consent cannot predominate. *Paldo Sign & Display Co. v. Topsail Sportswear, Inc.*, No. 08-CV-5959, 2010 WL 4931001, at *2–3 (N.D. Ill. Nov. 29, 2010) (Rule 23(b)(3) is satisfied because the method by which defendant obtained and used fax numbers made individualized consent unlikely, and noting that "evidence regarding consent would be in [defendant's] hands if it is anywhere, yet [defendant] has offered nothing to suggest that any of the recipients might have consented to receive a faxed advertisement").

Here, Defendants have no evidence of consent. FDE obtained phone numbers to call from third parties, Bisesi Dep. 66:4–7; Dziuban Dep. 14:23–15:1, and Defendants made no attempt to seek permission themselves. *See Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 844 (7th Cir. 2022) ("In some cases brought under the [TCPA], where the [caller] purchased a contact list from a third-party vendor and made no attempt to seek permission from any of the recipients before sending the fax advertisement, there is a generalized, class-wide manner of proving lack of consent."). Defendants had proffered a purported opt in from Plaintiff containing a Jornaya "LeadiD," but the asserted LeadiD is not connected to Plaintiff or his phone number and would not supply consent to Defendants even if it were. *See* Exhibit D, pp. 1–4. Defendants concede that they lacked consent when they voluntarily dismissed their counterclaim.

In addition, a random sampling of 21 Jornaya LeadiDs showed that *none* of the LeadiDs associated with purported opt-in records from FDE's lists represented legitimate consent. *Id.* Of the 21 LeadiDs that were sampled, 10 (nearly 50%) of them were not even legitimate LeadiDs.

Exhibit D, pp. 5–7. The other 11 LeadiDs returned information that did not match the lead data contained in FDE's file. *Compare id.* p. 56 *with* pp. 15–55; *see also* Comparison Summary at pp. 57–58. Furthermore, the "TCPA disclosures" contained in the TCPA Guardian Reports do not identify any Defendant. *See id.* Therefore, issues of consent will not predominate.

        2.      **Vicarious Liability:** Under section 227(c)(5) of the TCPA, Plaintiff and Class members have a right of action against the person who placed the call (undisputedly, FDE), and the persons on whose behalf the calls were placed. The TCPA incorporates common law principles of agency, and imposes liability on the principals of FDE. *See Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021). Common questions on vicarious liability predominate. *See Williams v. Pillpack LLC*, 343 F.R.D. 201, 207 (W.D. Wash. 2022).

        a.      **Actual Authority:** Agency is a "fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 742 (N.D. Ill. 2014). Agency can be created by contract or conduct. *Id.* at 744.

Here, each Class member can rely on common evidence showing FSB exercised actual authority of FDE. First, FDE admitted in court filings in prior cases that it purchased leads and placed calls ***for FSB***. *See Albrecht v. National Bancorp Holdings, Inc.*, Case No. 8:19-cv-00810-DOC-JDE, FDE Marketing Cross Claims Against Best Rate Holdings, LLC, ¶ 22 (ECF No. 78), attached hereto as Exhibit M (emphasis added) ("FDE Marketing purchased consumer mortgage leads from Best Rate . . . *for The Federal Savings Bank*." In addition, "FDE would use the information *to make live transfer lead calls for Federal Savings Bank*." *Id.* ¶ 28 (emphasis added). Bisesi testified that FDE called on behalf of FSB. Bisesi March Dep. 52:19–53:1, attached hereto

17

as Exhibit N.

Second, FSB provided FDE with the "filters" regarding the characteristics of the consumers FSB wanted to be transferred and the types of loans FSB was interested in selling. *See* PE 31, p. 51–53; Second Katz Dep. 65:13–22; Dziuban Dep. 41:1–5; Bisesi Dep. 63:5–20. FDE used those filters to determine whom to call. *See* Bisesi Dep. 173:2–10; PE 31, p. 51–53 ("What filters are we running right now?"). In *Smith v. State Farm Mutual Auto. Ins. Co.*, 30 F. Supp. 3d 765, 775–76 (N.D. Ill. 2014), a similar live transfer operation was found to establish actual authority.

Third, FSB advances money to FDE and Defendants track the budget as calls are transferred using Boberdoo. Bisesi Dep. 78:9–81:11; Korey Dep. 38:10–14. When the budget gets low, FDE issues an invoice to keep the operation going. *Id.* Katz testified that he takes measures to control the rate at which FDE transfers calls, so that FSB can handle the transfers and the budget lasts for a predetermined period. Second Katz Dep. 136:9–137:24. And he monitors this daily. *Id.*

Fourth, FSB was FDE's only outbound client. *See* PE 6 (Bisesi: "Eric [Katz] is my only outbound client"); PE 7, p. 13 (Bisesi: "Eric [Katz] has always said he wants them all [*i.e.*, leads] and keep them coming and by all means he is our biggest client and he can have them all or any amount he wants less or more"); PE 31, p. 51 (Bisesi: "I have other banks asking for business but [m]y answer is always no. I send you Eric everything we produced in those/your filters ... we only focus[] on your needs. I avoided taking any other clients['] orders because that's always been our deal" . . . "Eric we are married brother and in it together so I can try and do anything you want me to do with a little notice …"); PE 33, p. 55 (Dziuban referencing "trying to keep [FDE] exclusive for you/FSB," and Katz stating "I'm not sharing this one."); PE 24, p. 37 (Bisesi "shut[s] down the system" in response to Katz saying "Just turn off."). FSB was by far FDE's biggest, if not only client, and used FSB filters "to determine who to place calls to." Bisesi Dep. 172:18–173:10. FSB

closely coordinated and monitored the conduct of FDE, including receiving daily reports of activities (*See* PE 26, p. 38 and Second Katz Dep. 136:5–22), and making or participating in FDE staffing decisions (*see* PE 30, p. 50 (coordinating schedules); PE 32, p. 54 (Katz: "I need personal assurance this agent is removed from my campaign IMMEDIATELY.")).

Fifth, FSB designated phone lines and supplied FDE with posting URLs so that data could be exchanged in real time as the call transfer occurred. Dziuban Dep. 17:22–18:1. FSB enabled FDE to post lead information directly into FSB's customer relationship management program through a posting URL. *See Lushe v. Verengo Inc.*, CV 13-07632 AB R, 2014 WL 5794627, at *5 (C.D. Cal. Oct. 22, 2014) (dedicated phone lines by which agents would transfer calls to defendant, and the ability to post lead information directly to defendant's system, supported agency relationship).

Sixth, FSB closely controlled FDE's call volume and the call destinations. *See* PE 2, p. 4 (Ms. Dziuban: "Slow down. Cut their volume in half"); PE 28, p. 48 (Mr. Katz: "Go hard today No Caps."); PE 35, p. 58 (Mr. Katz: "Where's the volume, let's crank"); PE 29, p. 49 ("I'm going to have to cap daily calls at 50."); Korey Dep. 31:1–32:19 (describing FSB's 2-year suppression policy for current customers and 90-day suppression policy for potential customers because "*we don't want to be calling* [customers with active files] *for 90 days*") (emphasis added). When FSB instructed FDE to "turn off the system," FDE complied. *See* PE 24, pp. 36–37. FSB instructed vendors not to buy leads or solicit in states with what FSB perceived as having stringent telemarketing laws. *See* PE 5, p. 9–10 ("Not worth buying any FL data"); PE 4, p. 6 ("Please confirm we are not soliciting to NY borrowers").

Lastly, FSB frequently reviewed call recordings provided by FDE. *See* PE 27, p. 47. FSB even gave FDE directions on the way in which FDE agents were to conduct themselves during the

19

calls. *See* PE 27, p. 45 (Katz: "Once my guy answers the phone I want it to be just like this" . . . . Bisesi: "You got it . . . ."); *see also* PE 8, p. 15 (Dziuban: "I need all live transfers to hand off the call 10 times faster than we are currently"). FSB also required that FDE confirm that loan details were up-to-date by asking questions before transferring the call to FSB. Bisesi Dep. 95:9–21; Second Katz Dep. 130:2–22. In *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 832 (N.D. Ill. 2016), the court held that a reasonable factfinder could infer control where "on at least one occasion, the [defendant's] attorneys proposed edits to the survey script being used." FSB frequently shared its conversion rates with FDE. *See* PE 9, p. 16. Providing such performance-based feedback and instructions regarding the manner in which to conduct the calls shows interim instructions and control. *See Lushe*, 2014 WL 5794627, at *5. This evidence can all be evaluated as common to Plaintiff and all class members.

Any argument that the National DNC Class is overinclusive because FSB claims that FDE had other bank clients would be unavailing because, even if it were true, then at most, these other banks would be jointly and severally liable alongside Defendants. *See In re Monitronics Int'l, Inc. Tel. Consumer Protection Act Litig.*, 2019 WL 7835630, at *4 (N.D.W.V. Apr. 3, 2019) (quoting *Aranda*, 179 F. Supp. 3d at 832)). "Where the purpose of telemarketing calls is to increase the flow of consumers to multiple businesses, then all of those businesses are sellers under the TCPA." *Id*. Defendants should not be rewarded for their poor recordkeeping practices. *Mullins*, 795 F.3d at 668. Or, "[i]f there are multiple companies that could have [harmed the plaintiff], then 'the common law of torts has long shifted the burden of proof to defendants to prove that their negligent actions were not the 'but-for' cause of the plaintiff's injury.'" *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 696 (7th Cir. 2015). Thus, it would be Defendants' burden to prove another bank was responsible for a portion of the calls that were not placed on behalf of FSB and NBH.

20

**b.** **Apparent Authority:** Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal. *Toney*, 75 F. Supp. 3d at 744. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems shows apparent authority. *See In re Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6592 (F.C.C. 2013).

Here, there is substantial evidence of apparent authority that can be resolved on a classwide basis. FDE agents only identify FSB after they find an interested consumer. Bisesi Dep. 73:2–6. FDE does not identify itself unless someone asks. *Id*. 74:1–9. FSB provides a posting URL so that FDE can immediately post the lead information in FSB's systems at the same time the call is transferred to FSB. Dziuban Dep. 17:16–18:10. In addition, in certain instances, FSB loan officers represented to consumers that *FSB* called them. First Katz Dep. 36:2–6 (FSB loan officer statement to prospective customer after call transfer: "I know that we called you"). From the perspective of the consumer, FDE and FSB were part of a seamless operation designed by FSB to gauge the consumer's interest and needs, and to pitch the consumer a loan product from FSB.

**c.** **Ratification:** Ratification occurs when an agent acts for a principal's benefit and the principal does not repudiate the agent's actions. *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 831 (N.D. Ill. 2016). In *Aranda*, ratification was a triable issue with evidence that the defendants were aware of a possibility that "some or all of the calls being made were unlawful under the TCPA and that each of them continued to accept business flowing from the campaign." *Id*.

Here, evidence of ratification is common to all Class members. Despite knowledge of complaints for years, Defendants refuse to take their TCPA compliance obligations seriously.

Howard Korey, FSB's Director of Strategic Marketing and Customer Experience, was aware that vendors FSB hired to make live transfers to FSB placed outbound calls to do so. Korey Dep. 18:4–6. FSB paid FDE for live transfers of FDE's outbound calls. Korey Dep. 18:4–6, 38:10–24.

FSB was aware of numerous complaints regarding unwanted phone calls that FSB traced to FDE. But FSB did nothing to prevent FDE from continuing the unlawful activity that generated business for FSB. Defendants have been involved in TCPA litigation before. *See Albrecht v. National Bancorp Holdings, Inc.*, No. 8:19-cv-00810-DOC-JDE (C.D. Cal.). Dziuban even referenced the *Albrecht* case in the context of receiving additional complaints about unwanted phone calls. *See* PE 12, p. 19 ("Isn't this the whole reason we are in litigation w/ Albrecht? . . . . Whether he had a good conversation is irrelevant if we can't prove the opt in……..again…."); *see also* PE 11, 12, 14, 15, 16, 18, pp. 17–28 (evidencing FSB's knowledge of complaints about FDE's unwanted telephone calls). FSB also possessed knowledge of facts sufficient to alert a reasonable person that FDE was involved in placing phone calls to people who did not consent to receive the phone calls. *See* Korey Dep. 53:13–20 (acknowledging being aware of at least 2 instances where FDE was unable to provide an opt-in after a complaint was received); Second Katz Dep. 127:18–128:7 (describing situations where "somebody would be transferred, and the loan information would not be as represented"). Evidence regarding FSB's ratification, including its knowledge of complaints and knowingly accepting the benefits, indicate common questions that predominate.

### E.    The Classes Satisfy the Superiority Requirement of Rule 23(b)(3)

Rule 23(b)(3)(A)–(D) of the Federal Rules of Civil Procedure set forth the matters pertinent to superiority. When applied to this case, these factors demonstrate superiority, largely for the reasons that many TCPA class actions have been certified pursuant to Rule 23(b)(3). The value of individual Class members' claims is generally on the low end, certainly lower than what would

22

economically justify bringing a lawsuit on an individual basis. This Court presents a good forum in which to concentrate the claims. *See* Fed. R. Civ. P. 23(b)(3)(C). "Manageability is almost never a bar to class certification." *Bakov v. Consolidated World Travel, Inc.*, 15 C 2980, 2019 WL 1294659, at *21 (N.D. Ill. Mar. 21, 2019). Here, no difficulties in managing the class action will arise. There are established ways of identifying and providing notice to Class members in accordance with Rule 23(c)(2)(B) and due process.

Woolfson employs a sound methodology for determining which calls on the CDRs constitute violations of the DNC provision of the TCPA. Woolfson correctly determined that the CDRs are reliable. The CDRs are authenticated by Patrick Kennedy, Ytel's custodian of records, as records used by Ytel for billing purposes, among other things. Exhibit O. The supposed indicia that the CDRs are unreliable advanced by Kostyun are innocuous. The calls from FDE numbers to other FDE numbers are likely test calls, not aberrations. Woolfson Reply ¶¶ 13–14 . The non-zero duration of the calls signify connections. *Id*. ¶¶ 15–26. And, connections to unassigned numbers are possible. *Id*. ¶¶ 27–29.

Woolfson's waterfall analysis based on a series of SQL queries against the CDRs, TelLingua data, and daily DNC lists, provide a reliable method for determining Class membership. Woolfson Decl. ¶¶ 33–34, 52; Woolfson Reply ¶ 34; Woolfson Amendment ¶¶ 8–10. To contrast, Kostyun employed a flawed and incomplete methodology to attack Woolfson that is belied by Kostyun's own documentation and testimony. Woolfson's use of the live transfer files to identify Transfer Subclass members was also sound. Woolfson Amendment ¶ 10. Kostyun's findings and opinions are irrelevant, without merit, and deficient.

In addition, Woolfson proposes a practical method of obtaining contact information to notify Class members using standardized records that are maintained by phone carriers in the

23

normal course of their operations in the EDI format. Woolfson Decl. ¶¶ 44–51, 56. The methods described by Woolfson have been approved by other district courts in the past, and should be supported here, where Defendants' records are not sufficient to identify Class members. As for the Transfer Subclass, the live transfer files include names and addresses. *Id*. ¶ 44.

Woolfson's proposed method of identifying Class members is fully "commensurate with the stakes." *Mullins*, 795 F.3d at 665–66 (approving notice plan "even though the notice plan likely would not reach everyone in the class"). In *Birchmeier*, 302 F.R.D. at 254, two ways to identify class members. Class certification was warranted because "Defendants' own expert has stated that it is possible to obtain historical subscriber information from each carrier, and plaintiffs have stated that they will obtain the information." *Id*. Thus, identification of class members was approved "using a combination of phone numbers in Defendants' records, the records of third-party phone carriers and third-party database providers." *Id*. at 247.

In *Bakov v. Consol. World Travel, Inc.*, 15 C 2980, 2019 WL 1294659, at *10, 12 (N.D. Ill. Mar. 21, 2019), the court observed that methods of identification of class members using records maintained by phone carriers were generally accepted in this District and elsewhere. There, the plaintiff's expert explained that the process the expert used "identifies users of a given telephone number for a given timeframe and provides a current address for that person based upon their address history." *Id*. "That information is derived from data vendors, such as TransUnion, LexisNexis, Experian, Microbilt, and others." *Id*.

Here, Woolfson proposes a method for identifying Class members using the records maintained by the phone carriers themselves and historical contact information that can be updated if needed by the court-approved notice provider according to procedures in which they have substantial expertise.

24

"[T]he fact that the carriers are under no obligation to maintain historical subscriber records does not answer the question of whether the subscriber identification information is maintained and available." *Keim v. ADF MidAtlantic, LLC*, 328 F.R.D. 668, 678 (S.D. Fla. 2018). Further, "it would be 'very odd' to not send subscribers of a phone number notice of this action simply because they might not end up being the 'user' of the phone." *Knapper v. Cox Communications, Inc.*, 329 F.R.D. 238, 245–46 (D. Ariz. 2019). "Though AT&T might not know the 'users' associated with each phone number. . . subscribers of a group calling plan can, or easily could, generally identify the names and addresses of the users on their own group calling plan." Alternatively, the Court can approve notice by text message, which would directly reach the authorized users of wireless phone lines. *See Yates v. Checkers Drive-In Rest., Inc.*, 17 C 9219, 2020 WL 6447196, at *3 (N.D. Ill. Nov. 3, 2020). Text message notice would also drastically reduce costs.

Woolfson describes a similar process, using the carriers' EDI protocol, which they rely upon in their ordinary course of business. Woolfson Decl. ¶¶ 44–53. Here, the Class is substantially larger than 900,000, making the plan of identification of Class members described by Woolfson even more reasonable and warranted under these circumstances.

## V.    CONCLUSION

For the reasons set forth above, Plaintiff requests an Order: (1) Granting his Motion for Class Certification; (2) Certifying the National DNC Class; (3) Certifying the Transfer Subclass; (4) Appointing Plaintiff as the Class Representative; (5) Appointing Thomas A. Zimmerman, Jr. and Mark L. Javitch as Class Counsel; (6) Granting his Motion to Bar Defendants' Expert Jan Kostyun; and (7) Granting such other relief as the Court deems appropriate.

Michael Anthony, individually, and on behalf of all others similarly situated,


By: /s/ Thomas A. Zimmerman, Jr.

Thomas A. Zimmerman, Jr.
*tom@attorneyzim.com*
Jeffrey D. Blake
*jeff@attorneyzim.com*
Zimmerman Law Offices, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020

Mark L. Javitch (admitted *pro hac vice*)
*mark@javitchlawoffice.com*
Javitch Law Office
3 East 3rd Avenue Ste. 200
San Mateo, California 94401
Telephone: (650) 781-8000

Attorneys for Plaintiff and the putative Classes